STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ABRAHAM FINE (CABN 292647)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3717
    FAX: (510) 637-3724
    Abraham.Fine@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>CHRISTINA BURDEN,<br><br>    Defendant. | CASE NO. 21-CR-0362-YGR<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: February 24, 2022<br>Time: 2:30 p.m.<br>Court: Honorable Yvonne Gonzalez Rogers |

UNITED STATES' SENTENCING MEMORANDUM   1
21-CR-0362-YGR

# INTRODUCTION

Defendant Christina Burden took advantage of the COVID-19 pandemic to line her own pockets. As described below, Defendant submitted five completed loan applications on behalf of two shell companies seeking money meant for businesses struggling in the face of the pandemic. Although Defendant's companies had no employees and no actual business, Defendant's loan applications fraudulently affirmed that her businesses had upwards of 89 employees and monthly payroll expenses north of $700,000. To support these false assertions, Defendant submitted doctored bank records and fake payroll tax forms. Ultimately, Defendant sought over $4.6 million in pandemic loans from the SBA, and actually received over $1.1 million from the government. Rather than use that money for payroll and other business expenses (as required by the CARES Act), Defendant spent hundreds of thousands of dollars on airline tickets, luxury vacations, private jet travel, several luxury vehicles, and items from Louis Vuitton, Nordstrom, and Neiman Marcus.

But the lies contained in Defendant's loan applications are not the only lies she has told. During the presentence report investigation in this case, Defendant lied repeatedly to the probation officer. She told the probation officer that everything she spent on herself was for her business, despite the fact that she has no real business and spent most of the money on luxury items for herself. She told the probation officer someone else completed her loan applications, despite the fact that an IP Address traced to Defendant's Oakland apartment submitted most of the loan applications and accessed her company's PPP account over 50 times. She told the probation officer that she gave "$300K+ in donations through blessing box co to various families in needs [sic] which are itemized." But Defendant's bank records show no such donations and Defendant has provided nothing "itemized" to support this claim. Earlier in the case, she told probation that she worked for Salesforce and apparently provided a Salesforce pay statement, only to later tell probation that she never actually worked at Salesforce (showing the pay stub she provided to be fraudulent).

Simply put, Defendant is a serial liar. She even lied on her resume to get the six-figure-salary job she had up until being charged in this case, telling Verily Life Sciences that she had an MBA from Stanford and a B.S. from Spelman college, despite the fact that she never attended either institution and does not have a college degree. Accordingly, for the reasons set forth below, the government

UNITED STATES' SENTENCING MEMORANDUM   2
21-CR-0362-YGR

respectfully requests that the Court sentence Defendant to 33 months imprisonment, a three-year term of supervised release (with the conditions recommended by probation and set forth in the plea agreement), $1,143,191 in restitution, a $400 special assessment, and order forfeiture of the items set forth in the plea agreement.

## BACKGROUND

**I.     Offense Conduct**

   **A.     Background on Federal Loan Programs**

The CARES (Coronavirus Aid, Relief, and Economic Security) Act is a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. *See* Presentence Investigation Report ("PSR") ¶¶ 6-10. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.

PPP loans are administered by the Small Business Administration (SBA) through approved lenders and are designed to assist small business owners with expenses such as payroll costs, rent, and utilities so that businesses can maintain their workforce during the COVID-19 crisis. The loan amount is determined by the monthly payroll of the small business. The loan money comes directly from the approved lenders to the applicant and is guaranteed by the SBA. To qualify for a PPP loan, the applicant's business must have been in operation on February 15, 2020, have employees, have average monthly payroll costs, and provide documentation to support these assertions. The PPP loan application requires the borrower to certify that the funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules. In addition, the PPP loan application requires applicants to state any other businesses they own, and specify whether they have applied for any other PPP loans.

In addition to PPP loans, struggling business were allowed to apply for the SBA's Economic Injury Disaster Loan (EIDL) Program during the COVID-19 pandemic. *Id*. ¶¶ 11-15. EIDL Advances are administered and funded by the SBA. EIDL Advances are designed to give emergency assistance to

small business that are experiencing a temporary loss of revenue due to the COVID-19 pandemic. To obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.

B. **Defendant's Fraudulent Loan Applications**

Defendant submitted four completed PPP loan applications and one EIDL loan application for multiple business entities, as indicated by the table below.[1]

| | Approximate Date of Application | Company Name | Program | Application submitted to | Status | Amount Sought |
|---|---|---|---|---|---|---|
| 1 | 04/07/2020 | Burden Consulting Group LLC | EIDL | SBA | Funded | $150,900.00 |
| 2 | 05/16/2020 | Burden Consulting Group LLC | PPP | Blue Vine | Funded | $307,916.00 |
| 3 | 06/11/2020 | Blessing Box Co. LLC | PPP | Divvy Pay | Denied | $1,854,166.67 |
| 4 | 06/18/2020 | Blessing Box Co. LLC | PPP | First Home Bank | Denied | $1,700,000.00 |
| 5 | 06/20/2020 | Blessing Box Co. LLC | PPP | Kabbage | Funded | $684,375.00 |
| | | | | | **TOTAL** | **$4,696,637.67** |

*Id.* ¶ 20. Each of these loan applications was fraudulent and contained myriad materially false statements. Specifically, each of the loan applications contained the following:

- False statements regarding ownership of other businesses. Despite owning multiple purported businesses (both Burden Consulting Group and Blessing Box), Defendant checked the box on each application indicating that she did not own any other businesses.

- False statements regarding the dates of operation of the subject entities. Defendant affirmed that each business was in operation before February 15, 2020 despite the fact that one of the entities was registered after that date and there is no evidence that any of the entities had any operations as of that

---

[1] Defendant also began the submission process for six additional PPP loan applications on behalf of Blessing Box and two other shell companies called Pinkies Place, LLC and Creative Synergy Group, LLC. Three of these applications were rejected for being incomplete and three were cancelled before submission.

date or any date.

- False statements regarding the number of employees and monthly payroll expenses. Defendant affirmed that her businesses had upwards of 89 employees and monthly payroll expenses north of $700,000. A review of Defendant's entities' tax records reveal, however, that none of them has ever paid any payroll taxes or submitted payroll tax forms. In fact, it appears the entities do not have any employees and do not do any legitimate business. And a review of Defendant's bank records make clear that the money received was not used for payroll.

- Doctored bank records. Each of Defendant's applications contained bank records supposedly supporting the entities' claims regarding payroll expenses. A review of the actual bank records, however, demonstrate that the bank records submitted in support of the loans were fraudulent.

- Fraudulent tax forms. Each of Defendant's applications contained tax forms (Form 940 or Form 941) supposedly showing payroll taxes supporting the number of employees and payroll she claimed. A review of the various entities' actual tax records, however, show that none of them ever filed such payroll forms with the IRS.

*Id*. ¶¶ 16-19. In total, Defendant submitted five completed loan applications seeking a total of $4,696,637.67. She received a total of $1,143,191 from those applications. Rather than use that money for payroll and other business expenses, Defendant's bank records reveal that she spent the money on airline tickets, private jet travel, several luxury vehicles, and items from Louis Vuitton, Nordstrom, and Neiman Marcus, specifically as follows:

- $184,000 on airfare, private jet travel, and hotel expenses
- $124,000 on luxury purchases from Louis Vuitton, Neiman Marcus, and Nordstrom
- $16,000 on boat and car rentals
- $14,000 on restaurant and entertainment

In addition to the expenditures noted above, Defendant wired over $460,000 to individuals who were not employees of the businesses nor did they have any connection to the businesses. Approximately $400,000 of this money went to Defendant's mother and her former fiancé, Aisha Chiappetta. At least $150,000 of those wired funds were spent on automobiles from Mercedes, Land Rover, and Nissan. *Id*. ¶¶ 21-24.

C. **Defendant's Additional False Statements**

As set forth in the PSR, Defendant provided the probation officer with several false or misleading written answers in response to the Presentence Interview Form. First, Defendant stated the following as to her fraudulent PPP loan applications:

> I hired a representative through an online black market to complete my PPP loan applications. I was unaware the representative and the online site was considered black market because it was a public site and because I was provided the contact information by several acquaintances I met through the Harris Twins Ministries.

*Id*. ¶ 29. The government has found no evidence to support this statement regarding a black-market representative who completed Defendant's PPP loan applications. Rather, the government's investigation revealed that an IP Address linked with Defendant's Oakland apartment accessed Burden Consulting Group's loan application page over 60 times between May 17, 2020 and May 27, 2020 and that most of Defendant's loan applications were submitted from that IP Address. *See* Case No. 21-mj-70195-VKD (Search Warrant Affidavit, at ¶¶ 43, 49). The investigation also revealed that the same IP Address accessed Blessing Box's loan application page over 50 times between June 19, 2020 and July 6, 2020. *Id*. at ¶ 61. These facts support the inference that it was Defendant, not some black-market representative, who completed the fraudulent loan applications.

Next, Defendant told probation as follows regarding the loan proceeds that she kept for herself: "Everything spent on my self was for my business (TradeMark Rights, Inc File – thirdparty provider to be a registered agent and keep my business in compliance, car payments, insurance)." PSR at ¶ 29. This is demonstrably false. As set forth in the PSR, Defendant spent hundreds of thousands of dollars on airline tickets, private jet travel, several luxury vehicles, and items from Louis Vuitton, Nordstrom, and Neiman Marcus. In no way were these expenses "for her business" (which business didn't actually have any employees).

In the same response, Defendant stated as follows regarding supposed donations she made: "I gave over $300K+ in donations through blessing box co to various families in needs [sic] which are itemized." *Id*. Defendant's and Blessing Box's bank records, however, show no such donations and Defendant has provided nothing "itemized" to support this claim.

Furthermore, the PSR stated as follows regarding Defendant's reporting of her supposed employment at Salesforce, and her submission of a seemingly fraudulent pay statement to probation:

> However, during the course of the investigation, the undersigned learned that the defendant had reported to her U.S. Pretrial Services Officer that she worked for Salesforce and provided a pay statement in support of that employment. When asked by the undersigned if she ever worked for Salesforce, she reported that she had a job offer but did not accept it. This left the undersigned questioning what would motivate the defendant to

provide conflicting, perhaps even fraudulent, information.
PSR at Sentencing Recommendation.

Apart from the statements made during the PSR process, the government's investigation has revealed that Defendant lied about her educational background to obtain her most recent job. The PSR sets forth that Defendant worked at Verily Life Sciences (a Google-owned company) from 2019 to 2021. *Id*. at ¶ 84. While there, she earned $170,000 per year as well as $100,000 in stock options. *Id*. Verily Life Sciences has confirmed Defendant's employment. Verily Life Sciences, however, also provided the resume and employment application Defendant submitted to Verily. *See* Fine Decl. Exs. A and B. In those documents, Defendant claimed that she earned a B.S. from Spelman College in 2009 and an M.B.A. from Stanford University in 2012. In reality, Defendant never attended either institution and has only completed approximately six months of college. *See* PSR at ¶ 78.

## II.   Procedural Posture

On February 3, 2021, the government charged Defendant, by complaint, with one count of bank fraud, in violation of 18 U.S.C. § 1344. ECF No. 1. Defendant was released pending trial on release conditions set by a magistrate judge in the Western District of Texas. On September 14, 2021, the government filed an Information charging Defendant with two counts of bank fraud, in violation of 18 U.S.C. § 1344 and two counts of money laundering, in violation of 18 U.S.C. § 1957. ECF No. 15. On February 24, 2022, Defendant will plead guilty to those four counts and be sentenced. ECF No. 20. Per the plea agreement, the parties agreed that the applicable Offense Level under the Sentencing Guidelines is 24, and the government agreed to recommend a sentence of 33 months in custody, as well supervised released, forfeiture, restitution, and a special assessment. *See* Parties' Proposed Plea Agreement.

## ARGUMENT

## I.   Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence

sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991.  In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), to include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II.     Sentencing Guidelines Calculation

As set forth in the PSR and the plea agreement, the Sentencing Guidelines calculations for Defendant's offense level is as follows:

|  | U.S.S.G. Section | Level/Points |
|---|---|---|
| Base offense level | §2B1.1(a)(1) | 7 |
| Specific offense characteristics | §2B1.1(b)(1)(J) - Intended loss amount between $3,500,000 and $9,500,000 | +18 |
|  | §2B1.1(b)(17)(a) - The defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense | +2 |
| Adjusted offense level |  | 27 |
| Acceptance of responsibility | §3E1.1 | -3 |
| Total offense level |  | 24 |
| Criminal History Category |  | I |
| **RANGE** |  | 51-63 months |

PSR ¶¶ 16-26.

The Probation Officer concluded that Defendant's criminal history score is 0, and she therefore falls into Criminal History Category I.  *Id*., ¶¶ 50-51.  As reflected in the PSR, the Guidelines range for imprisonment associated with adjusted offense level 24 and Criminal History Category I is 51 to 63

UNITED STATES' SENTENCING MEMORANDUM   8
21-CR-0362-YGR

months. *Id*. ¶ 88. The Probation Officer recommends a 30-month sentence. *Id*. at Sentencing Recommendation.

### III. The United States' Sentencing Recommendation

Based on a consideration of the Guidelines and the factors in Section 3553(a), the United States submits that a sentence of 33 months' imprisonment, coupled with a three-year term of supervised release, a restitution order, and a forfeiture order are sufficient, but not greater than necessary, to comply with the factors set out above.

Primarily, the government notes that Defendant's charged conduct was extremely serious. The PPP and EIDL fraud was undertaken during a time of great national hardship. Many legitimate businesses were in need of the type of PPP and EIDL loan funds that Defendant obtained; the defendant took advantage of a program that was meant to make those funds flow easily to needy legitimate recipients – and not to her. As described above, funding for the PPP program was capped, so any money Defendant obtained from the program did not go to other struggling businesses that needed it. And what Defendant did with that money was equally egregious. Rather than use that money for payroll and other business expenses, as required by the CARES Act, Defendant used the money to fund her luxurious lifestyle, galavanting around the world on private jets, staying at the finest hotels, purchasing the most expensive vehicles, and spending eye-popping amounts of money on fashion accessories.

Moreover, both specific and general deterrence are important principles to consider here. As to general deterrence, and as noted above, the government funds at issue in the PPP-loan fraud aspect of this case flowed freely – as they should have – during a time of national hardship. Other individuals who are in Defendant's position now and in the future must know that, on top of a federal felony conviction, defrauding programs like the PPP will result in prison time and monetary penalties. As to specific deterrence, Defendant's pattern and variety of criminal activity, as well as her false and misleading statements during the presentence investigation, indicate that there is a danger that she might re-offend. A prison sentence of 33 months here will send a strong message to her that criminal conduct in the future will result in even lengthier imprisonment.

Given the seriousness of Defendant's conduct, the Court may wonder why the government is recommending a below-Guidelines sentence in this case. The answer is threefold. First, Defendant

accepted responsibility, waived indictment, and agreed to plead guilty shortly after her arrest. She could have taken the case up to the eve of trial and likely still received some acceptance of responsibility points under the Guidelines. But she didn't, and she should get some credit for that.

Second, the Guideline range in this case is based on an attempted loss amount of approximately $4.6 million. Defendant, however, only received approximately $1.1 million from her fraud. There is no dispute that the attempted loss amount is the correct figure to use when calculating the Guideline range. But the consequences of Defendant's conduct would have been far worse had Defendant actually received the $4.6 million she sought. Had the Guideline range been based on the actual loss amount, Defendant's Guidelines range would have been 33-41 months. Although the parties agree that 51-63 months is the correct Guidelines range here, the difference between the actual and attempted loss amount factored into the government's sentencing recommendation.

Third, one of the § 3553(a) factors is the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. As the Court might expect, Defendant was not the only person to commit PPP fraud, and many others around the country who committed similar crimes have already been sentenced. A representative sample of some of those sentences are as follows:[2]

- *United States v. Price*, No. 20-cr-0522-VDG (S.D. Texas) (Defendant received a 110 month sentence for PPP fraud scheme in which he sought $2.6 million in fraudulent loans and actually received $1.6 million).

- *United States v. Bellamy*, No. 21-cr-60064-RKA (S.D. Florida) (Defendant received a 37 month sentence for PPP fraud scheme in which he obtained $1.2 million in fraudulent PPP loans)

- *United States v. Devlin*, No. 21-cr-0226-MMC (N.D. Cal.) (Defendant received an 18 month sentence for PPP and other fraud schemes in which she obtained $565,000 in illegal proceeds)

- *United States v. Jackson*, No. 20-cr-00112-MJN (S.D. Ohio) (Defendant received a 24 month sentence for PPP fraud scheme in which he obtained $2.5 million in fraudulent PPP loans)

- *United States v. Tubbs*, 20-cr-00193-BSM (E.D. Ark.) (Defendant received a 41 month sentence for PPP fraud scheme in which he obtained $2 million in fraudulent PPP loans)

---

[2] Several websites have been tracking CARES Act Fraud cases and sentences, such as https://www.whitecollaradvice.com/ppp-fraud-sentencing-outcomes/; and https://www.arnoldporter.com/en/general/cares-act-fraud-tracker/.

UNITED STATES' SENTENCING MEMORANDUM   10
21-CR-0362-YGR

- *United States v. Oskar*, 21-cr-0144-CRB (N.D. Cal.) (Defendant received a 12 month + 1 day sentence for PPP fraud scheme in which he obtained $480,000 in fraudulent PPP loans)

- *United States v. Amiryan*, 20-cr-0520-DMG (C.D. Cal.) (Defendant received a 41 month sentence for PPP fraud scheme in which he obtained $650,000 in fraudulent PPP loans)

- *United States v. Llerenas*, No. 21-cr-0187-JWH (C.D. Cal.) (Defendant received a 63 month sentence for PPP fraud scheme in which she obtained $4.3 million in fraudulent PPP loans)

Given the pandemic fraud sentences that have been ordered throughout the country, the government submits that a 33 month sentence is appropriate in this case.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Defendant to 33 months in prison, a three-year term of supervised release, $1,143,191 in restitution, and a $400 special assessment. The Court should also order Defendant to forfeit her interest in the items set forth in paragraph 11 of the parties' proposed plea agreement.

DATED: February 17, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

*/s/ Abraham Fine*
ABRAHAM FINE
Assistant United States Attorney