RANDY SUE POLLOCK
Attorney at Law (CSBN 64493)
286 Santa Clara Avenue
Oakland, CA 94610
Telephone: (510) 763-9967
Facsimile: (510) 380-6551
rsp@rspollocklaw.com

Attorney for Defendant
CHRISTINA BURDEN

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>CHRISTINA BURDEN,<br><br>                    Defendant. | **Case No. CR. 21-00362-001-YGR**<br><br>**SENTENCING MEMORANDUM**<br>**ON BEHALF OF CHRISTINA BURDEN**<br>——————————————————<br><br>**Date:  February 24, 2022**<br>**Time:  2 p.m.**<br>**Ctrm:  Hon. Yvonne Gonzalez Rogers** |

## INTRODUCTION

Christina Burden is a 32-year-old woman with no prior criminal record who stands before this Court prepared to plead guilty to five serious federal offenses stemming from her fraudulent filings for PPP loans and EIDL funds that she was not entitled to receive.  Ms. Burden admits her conduct and genuinely expresses remorse for committing these offenses. She has spent the past year volunteering at local charities and engaging in self-examination of her conduct. See **Exhibit A**, Ms. Burden's letter and **Exhibit B**, verification of charitable work.  While her conduct involved eleven loan applications, the actual loss resulting from her actions is limited to the loans that were funded---$9992,291 in PPP loans and $150,900 from an EIDL loan.

After reading the presentence report it would appear that Ms. Burden was able to overcome significant challenges from her childhood and obtain high level employment as an executive

recruiter with companies such as Amazon, Facebook and Verily.  However, upon closer review of the presentence report there is a different picture of Ms. Burden that emerges that discloses mental health problems stemming from her childhood that most likely are at the root of her criminal conduct.

From the outset of these proceedings Ms. Burden quickly acknowledged that she would enter a plea of guilty and she hoped to pay full restitution at the time of sentencing. Unfortunately, she has been unable to obtain the funds to pay any restitution currently, but she has every intention to do so once she is on supervised release.

The plea agreement in this case sets the base offense level at 24 with the following enhancements:

1.  Eighteen points for Attempted Loss amount that exceeded $3,500,000 and

2.  Two points for deriving more than $1,000,000 in gross receipts.

With a reduction for acceptance of responsibility, the total offense level is twenty-four which carries a guideline sentence of 51-63 months.  As part of the plea agreement the government will recommend a downward variance sentence of 33 months.  The probation report recommends a sentence of 30 months.

## I.

## CHRISTINA BURDEN'S PERSONAL BACKGROUND
## WARRANTS A VARIANCE UNDER USSG SECTION 5H1.3

From reading about Christina Burden's background in the presentence report [paragraphs 57-63], which is confirmed in her mother's letter to this Court (**Exhibit B**), it is clear that she had a very difficult childhood.  As a child she grew up in a crime-ridden area of Austin and "for weeks at a time she lacked hot water, electricity and food" in her home.  While that alone greatly impacts a child's development, her mother was active in an evangelical family church that controlled their lives. The church dictated Ms. Burden's schooling and associations.  The most dramatic impact of the church on Ms. Burden occurred when she 'came out' at age 17 and the pastor "beat [her] with a Bible…so that the gay demon would come out." [Par. 63].  While that incident spearheaded their departure from the church, the damage to Ms. Burden had been done.

There are numerous studies that have discussed how religious trauma causes significant emotional trauma, be it impeded social or sexual development, poor decision-making skills, as well as lack of self-confidence and self-esteem.  Since the 2016 election there has been more discussion in articles and in social media about religious trauma and how it manifests itself.  Just last year in an article in the *New Republic* entitled *"Can Religion Give You PTSD"* (March 23, 2021), Stephanie Russell-Kraft wrote that former evangelicals struggle to overcome the toll those ideologies had taken on their minds and bodies.  The article (attached as **Exhibit C)** aptly noted that as evangelicals, people had been raised to be suspicious of therapy and now survivors are turning to mental health practitioners for help.

The article explains that religious trauma like sexual trauma is very real and requires therapy to recover.  The author notes that in 1993 psychologist Marlene Winell published *Leaving the Fold*, a self-help book for former Christian fundamentalists deciding to forsake their religion.  Winell coined the phrase "*religious trauma syndrome* as the condition experienced by people who are struggling with leaving an authoritarian, dogmatic religion and coping with the damage of that indoctrination." The article notes that psychologist Darrel Ray likens the symptoms of formerly religious people to PTSD.  As he said in the article, "with many people, when you dig deeper you find it came right out of religion."  He believes religious trauma to be considered a type of complex post-traumatic or stress disorder.

What is striking in Ms. Burden's letter and in her mother's letter to this Court is the fact that when she asked for therapy to understand herself, her mother, because of her strong adherence to the teachings of the church, did not consider Ms. Burden's cry for help.  Now in looking back on the years she spent with the church Ms. Brown explains as follows:

> "I did not realize the horrific and mental anguish of abandonment, rejection, hurt, not having basic needs met, bullying, having to give and be in church every time the doors were opened, and moving numerous times had on Christina. She has masked her pain for over 25 years and developed a savior complex, religious complex and a need to be accepted by others complex. Christina had a need to always give so that she could help save the people. She believed the more she gave, the more she would receive to be able to be better and help more people because that is what she was taught in church and had a

desire to have friends and be accepted by those friends. Christina now calls the church she grew up in a cult and I have to agree."

"I realized when Christina was around seventeen, how the church leaders and members had been rejecting her, talked about her, degraded her, and continued to tell her she would be nothing. Christina was too afraid to tell me because she believed that was normal because she thought she had to be punished because she did not give enough. I did not think at that time to have her go to counselling and really listen to Christina. My solution was to go to another church. The church we moved to, the pastor and his family bullied her. This time, I did speak up and the pastor was transferred, but again Christina thought bullying was okay, she did not receive counseling, nor did I listen to her. Her outlet was to continue to find ways to give to others."

The presentence report reveals in many ways how Ms. Burden's psychological and emotional status has been impacted by her years in an evangelical church. Until this offense she never had any mental health counseling. While she has been able to obtain impressive employment positions there are aspects of her life that are perplexing, notably the following:

- A long-term relationship with a woman twelve years her senior
- Her financial naivete as shown by (1) keeping her car in a lot at SFO for the past year and paying a daily fee, (2) her belief that the Harris Twins Ministries and her former girlfriend would repay her the funds she gave them; and (3) paying rent on her unoccupied Chicago apartment as well renting another apartment in Austin
- Her successful career as an executive recruiter earning a hefty salary, yet obtaining the CARES relief funds

USSG§5H1.3 specifically states that "mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from typical cases. In certain cases, a downward departure may be appropriate to accomplish a specific treatment purpose." Courts have recognized that this is an important factor to acknowledge.

See *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). *See also, State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

In this case Christina Burden is a young woman who clearly had a disadvantaged childhood with religious trauma as well as emotional issues stemming from her father's rejection. The difficulties she faced in her formative years were very real and are recognized by her close friends and colleagues in their letters. **See Exhibit D.** Her childhood presents significant issues that impact a person's development and clearly have been 'A' cause of Ms. Burden's actions in this case.

## II.

## A VARIANCE IS WARRANTED BASED ON MS. BURDEN'S
## NEED FOR INDIVIDUAL TREATMENT

The Sentencing Reform Act (SRA) directs district court judges to consider the need for a sentence "to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner."  18 U.S.C.§3553(a)(2)(D).  Two key principles regarding rehabilitation are at the core of the SRA. First, that rehabilitation is a legitimate aim of sentencing and that judges are required to consider a defendant's need for rehabilitation in imposing sentence and fashioning sentences.  Second, that prison does not advance the goal of rehabilitation.  As noted by the Supreme Court in *Tapia v. United States*, 564 U.S. 319, 330 (2011), "Do not think about prison as a way to rehabilitate an offender."

A recent law review article by Erica Zunkel entitled *"18 U.S.C. §3553(A)'S Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in 'the Most Effective Manner,'"*[1] addressed the BOP's limitations in providing effective mental health care.  This article explains that mental health problems are rampant in the federal prison population.  It notes that a 2006 DOJ study found that approximately 44.8% of all federal inmates have some mental health problems and that female inmates had a higher rate of

---

[1] Notre Dame Journal of International & Comparative Law, volume ix, Issue 1, Article v, January 27, 2019.

1   mental health problems than male inmates: 61% compared to 44%.  The article explains BOP's

2   mental health services as follows:

> The BOP Psychology Services Department is structured in a way that
> makes providing "the most effective" care impossible. According to the BOP's
> Psychology Services Manual, the responsibilities of the BOP psychologists are
> ranked by priority. The psychologists are directed to give first priority to crisis
> intervention, suicide prevention, treatment of severely mentally ill inmates,
> treatment of BOP employees, and the initial screening of inmates. Brief
> counseling, individual psychotherapy, and group therapy—the treatment
> options that an inmate can request by self-referral—are all prioritized after
> these more emergent mental health issues. Even in the second tier, whether an
> inmate can even get individual and group therapy is contingent upon five
> factors: (1) the type of psychological program(s) diagnosed; (2) limits on
> professional expertise: (3) the inmate's motivation to participate in treatment.
> (4) departmental staffing levels; and (5) departmental priorities. Ultimately,
> "[m]ental health providers in Psychology Services make the final
> determination regarding who will receive psychological care, and the nature of
> the care they will receive." This means that for inmates with mental health
> issues, there is simply no guarantee that they will receive *any* treatment, which
> is directly at odds with § 3553(a)(2)(D)'s mandate. *Notre Dame J. Int'L &
> Comp. L.* vol.9:1 at 661-62.

18   The article further notes that in a 2017 report by the Office of the Inspector General, BOP

19   data showed that only "3 percent of the …inmate population was being treated regularly for

20   mental illness."  The report states that this was due to the lack of necessary staffing resources to

21   meet the policy's increased treatment standards.  Now the pandemic has additionally impacted the

22   ability of BOP to provide treatment to inmates.

23   In sentencing an offender, a court must consider the §3553(a)(2)(D)'s directive for

24   treatment in the most ***effective*** manner.  As the probation officer has pointed out in her

25   recommendation, "it appears the defendant would benefit from weekly individual therapy that

26   would be best provided on supervised release."  While the probation officer recommends a

27   sentence reduction to 30 months to balance the need for punishment and recognizes that Ms.

28   Burden needs the opportunity to address her mental health issues, counsel respectfully requests a

reduction to 24 months.  This reduction is based on the conclusions highlighted in this law review article that the BOP does in fact have limitations on its ability to provide effective treatment.  A sentence of 24 months will still afford adequate deterrence to criminal conduct and protect the public from further crimes.   Additionally, studies have shown that a focus on rehabilitation and treatment more than punishment serves best to reduce recidivism.  The value of a sentence of 24 months is that it will return Ms. Burden to her community sooner so that she can obtain a job[2], begin paying her restitution and commence individual therapy tailored to her specific needs.

## CONCLUSION

Ms. Burden has unique psychological issues in large part stemming from her religious trauma.  Counsel completely agrees that a prison sentence is warranted for these offenses.  The agreement with the government for a sentence of 33 months, while very reasonable given the facts of the case and Ms. Burden's status as a first-time offender, does not take into consideration her mental health issues which very likely played some role in the commission of these crimes. The "**WHY**" of this offense that has baffled the probation officer has likewise perplexed counsel. There are many unanswered questions and actions by Ms. Burden that need to be addressed in a therapeutic setting.  Accordingly, counsel requests a sentence of 24 months followed by supervised release with the conditions laid out in the presentence report.

Dated:  February 17, 2022                     Respectfully submitted,


                                        /s/ *Randy Sue Pollock*
                                        RANDY SUE POLLOCK
                                        Counsel for Defendant CHRISTINA BURDEN

---

[2] Two of her character references, Dr. Damian Hall and Prasnat Kishor are prepared to offer Ms. Burden consulting jobs upon her release from custody.